UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RUSS BELLANT, et al.,

          Plaintiffs,

                                 Case No. 2:17-CV-13887

v.

                                 HON. GEORGE CARAM STEEH

RICHARD D. SNYDER et al.,

          Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [ECF NO. 11]

This action challenging the constitutionality of Michigan's Emergency Manager Law, the *Local Financial Stability and Choice Act*, Act No. 436, Public Acts of 2012, Mich. Comp. Laws Ann. §§ 141.1451 *et seq*. (West 2013) ("PA 436"), was commenced by plaintiffs who include local elected officials, unelected citizens, and members of the governing boards of various religious and civil rights organizations. Defendants, the Governor and former and current Treasurers of the State of Michigan, move to dismiss the single count alleged by plaintiffs in their Complaint for Declaratory Relief. For the reasons stated below, defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART.

I.    <u>Procedural Posture</u>

Plaintiffs bring this action under 42 U.S.C. § 1983, challenging the constitutionality of PA 436.  The claim under the Fourteenth Amendment's Equal Protection Clause was originally asserted in an earlier action, *Phillips v. Snyder*, No. 13-cv-11370.  The parties stipulated to the dismissal of that claim without prejudice to allow plaintiffs' appeal of this court's dismissal of their other claims.  *See Phillips v. Snyder*, 836 F.3d 707, 713 (6th Cir. 2017).  The Sixth Circuit affirmed the dismissal and the Supreme Court denied plaintiffs' certiorari petition.  *Bellant v. Snyder*, 138 S. Ct. 66 (2017).

In their complaint, plaintiffs argue that on its face, as applied, and in practice, PA 436 violates the Equal Protection Clause by disparately impacting and intentionally discriminating against municipalities and school districts comprised of majority black populations.  Plaintiffs allege that PA 436 is facially discriminatory because it was adopted with knowing intent that the measures resulting in the total loss of local governing power would be disproportionately imposed on black communities given the sensitivity of their revenue streams and human services to economic downturns, while majority white communities would escape PA 436's application.  As applied, PA 436 allegedly discriminates against black communities while it

is not applied to white communities suffering equal or greater financial distress.

II.    Background of PA 436

Prior to 1988, municipalities in Michigan that were experiencing financial difficulties could be placed into receivership by the courts.  Court-appointed receivers were compensated from the property that the courts placed within the care of the receiver.  In 1988, the State of Michigan enacted PA 101, which allowed the State to appoint an emergency financial manager ("EFM") over cities experiencing a financial emergency.  In 1990, the legislature replaced PA 101 with the *Local Government Fiscal Responsibility Act*, PA 72, which authorized Michigan's local financial emergency review board to appoint an EFM only after the Governor declared the local government to be in a financial emergency.  The EFM's powers extended to matters of finances, including the authority to renegotiate contracts, while local elected officials remained in control of administrative and policy matters.  Under PA 72, the State's local financial emergency review board appointed EFMs in the cities of Benton Harbor, Ecorse, Flint, Hamtramck, Highland Park and Pontiac, as well as over the Detroit Public Schools.

In 2011, Michigan repealed PA 72 when it passed the *Local*

*Government and School District Fiscal Accountability Act*, PA 4.  PA 4

converted all EFMs into Emergency Managers ("EM") and expanded the

scope of their powers.  EMs could act "for and in the place of" the

municipality's elected governing body, including a general grant of

legislative power.

Citizens gathered signatures to place a referendum on the ballot to

reject PA 4.  The petitions were certified on August 8, 2012, and by

operation of law PA 4 was suspended and PA 72 went back into effect.  All

PA 4 EMs were reappointed as PA 72 EFMs.  At the general election on

November 6, 2012, Michigan voters voted to reject PA 4.

During the lame-duck session that followed the repeal of PA 4, the

state legislature passed, and the Governor signed, the *Local Financial*

*Stability and Choice Act*, PA 436.  PA 436 changed the title of EFMs to

EMs and expanded the scope of their powers to cover all the conduct of

local government - both finance and governance.  PA 436 contains some

new provisions for local government not present in previous laws, including

expanded local government options to address the financial emergency[1]

---

[1] A local government has four options when confronted with a finding of a financial emergency: the local government can (1) enter into a consent agreement with the state treasurer; (2) accept the appointment of an emergency manager; (3) undergo a neutral evaluation process, which is akin to arbitration, with its creditors; or (4) enter into Chapter 9 bankruptcy. § 141.1547(1)(a)–(d).

and a procedure to remove the EM after he or she has served 18 months.[2] The EMs appointed under PA 4 and EFMs appointed under PA 72 all became EMs under PA 436.

Since PA 436 took effect on March 28, 2013, thirteen local units of government and five school districts have been under emergency management. But currently, no local governments in Michigan are subject to emergency management. Two school districts, Benton Harbor Area Schools, and Pontiac Public Schools, are subject to consent agreements. Muskegon Heights School District is under a receivership transition advisory board ("TAB")[3], but it is not represented by any of the plaintiffs in this case for purposes of bringing an as-applied challenge.

The City of Detroit, which proceeded through bankruptcy under an EM, is no longer subject to PA 436. Rather, the City is subject to both the confirmed bankruptcy plan and a legislatively created financial review commission created as part of what was referred to as the "Grand Bargain." §§ 1631-1638; *In re City of Detroit,* 524 BR 147, 244 (2014). The Detroit

---

[2] If a local government wishes to have an emergency manager removed before that emergency manager has served eighteen months, the law provides the local government with a mechanism for petitioning the governor to do so. § 141.1549(11).

[3] PA 436 allows the governor to appoint a receivership transition advisory board (TAB) once the financial emergency in a given locality has been rectified. § 141.1563. TABs generally monitor the operations of the local government and ensure that it is operating in a financially conscious and sound way. *Id.*

Public Schools (DPS) and its School Board are no longer subject to PA 436. They have been replaced by the new Community Schools District and exist only for the limited purpose of paying off DPS debt. Mich. Comp. Laws § 380.12b (1)-(15); 380.383; 380.384.  Neither the DPS nor the new Community District is currently subject to PA 436.

III.    Impact of PA 436

Ten of Michigan's thirteen majority black communities had a solution under PA 436 imposed upon them by the State.  In contrast, only four majority white communities have come under PA 436, and their city officials selected whether to have an emergency manager or to enter a consent agreement.

The Michigan Department of Treasury previously maintained a scoring system to determine the financial health of the State's cities and townships.  Fiscal indicator scores between five and seven placed a municipality on a fiscal watch list, while scores between eight and ten resulted in the community receiving consideration for review.  Six out of seven communities (85%) with a majority population of racial and ethnic minorities received EMs when they had scores of seven.  At the same time, none of the twelve communities with a majority white population received an EM despite having scores of seven or higher.

In 2010 the State's scoring system was taken over by a private company, Munetrix.  Munetrix is a municipal financial metrics company that consults with municipalities on budgeting, forecasting and reporting.  Their numbers allegedly indicate that numerous predominately white school districts were in as much fiscal distress as those that received EMs, yet no predominately white school district came under PA 436 or received an EM.

While recognizing that there are presently no EMs in office, plaintiffs assert that 56% of the State's black population is under the continuing effects of an EM, a consent agreement or a TAB, while only 3% of the State's white population is similarly impacted.    Plaintiffs allege that as a result of PA 436, a disproportionate number of minorities are under the control of an EM instead of the local officials who were voted into office.

## LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint.  Viewing the facts in a light most favorable to the plaintiff, the court assumes that the plaintiff's factual allegations are true in determining whether the complaint states a valid claim for relief.  *See Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

ANALYSIS

I.      Mootness

        "The test for mootness 'is whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . .'" *McPherson v. Michigan High Sch. Ath. Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (citation omitted). No local governments in Michigan have an EM at this time, so defendants argue that plaintiffs' lawsuit is moot. However, under P.A. 436, the EM's budget cannot be amended for two years following a community's exiting of receivership – including all contractual and employment agreements – and EM orders and ordinances cannot be amended for one year following receivership. MCL 141.1561(2). For this reason, plaintiffs argue that most communities are still under PA 436's ongoing restrictions.

        Plaintiffs describe the residual effect of PA 436. The EM is given broad authority during the period of supervision and their decisions have a lasting impact. This is no different than a new city council that is bound by

decisions made by its predecessor. Viewed this way, only the two school districts that are currently under a consent agreement, Benton Harbor Area Schools and Pontiac Public Schools, have a claim under the Equal Protection Clause that is not moot.

Plaintiffs' next argument, that PA 436 is likely to be invoked again with the next economic downturn, is speculative. As the Sixth Circuit found, PA 436 is not triggered by the wealth of a community but rather by its solvency, which is the result of how a community manages its resources. *Phillips*, 836 F.3d at 719. While there is an exception to mootness where the issues presented are capable of repetition and review may again be evaded, *Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309 (6th Cir. 2004), financial management of a community is not predictable for purposes of the mootness exception.

The court finds that plaintiffs' Equal Protection Clause claim is moot as to all the local units of government and school districts represented by plaintiffs except for the Benton Harbor Area Schools and Pontiac Public Schools.

II. <u>Standing</u>

To invoke the subject matter jurisdiction of an Article III federal court, individual plaintiffs must establish, among other things, an injury-in-fact that

is concrete and particularized, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The harm that plaintiffs allege is from the enforcement of any of PA 436's four remedial options, not only the loss of locally elected officials' governing authority due to the appointment of an EM.  Defendants concede that if the court construes the complaint to encompass all four of PA 436's options, then the two school districts have standing.

Benton Harbor Area Schools and Pontiac Public Schools are currently subject to PA 436 consent agreements.  The consent agreement applicable to Pontiac Public Schools provides that if the governor chooses to place the school district into a "receivership," which means an EM will be appointed in response to a material breach of the consent agreement, the district cannot contest that decision.  Benton Harbor Area Schools' consent agreement contains very similar provisions. Therefore, in addition to still being subject to PA 436 because they are bound by consent agreements, it is possible that each school district could have an EM reappointed if either district is found to have breached the consent agreement.

The court finds that Pontiac City Council Member Kermit Williams and Benton Harbor Commissioners Donald Watkins, Duane Seats, Juanita Henry and Mary Alice Adams have standing to bring this lawsuit on behalf

of Benton Harbor Area Schools and Pontiac Public Schools.

III.     Former State Treasurer Defendants Dillon and Clinton

Plaintiffs stipulate to dismiss their claims against former State Treasurers Dillon and Clinton for the reason that the claims are barred by the Eleventh Amendment.

IV.    Equal Protection Clause

The Fourteenth Amendment of the United States Constitution provides in relevant part that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has stated that this language "embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). Equal protection prevents states from making distinctions that burden a fundamental right, target a suspect class, or intentionally treat one individual differently from others similarly situated without any rational basis. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005). To state an equal protection claim, a plaintiff must "adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr.*

*for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citations omitted).

Invidious discriminatory intent is an impermissible justification for state action, which triggers strict scrutiny. *See Arlington Heights,* 429 U.S. at 265-66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [judicial] deference is no longer justified."); *Yick Wo*, 118 U.S. at 373 ("Though the law itself be fair on its face . . . if it is applied and administered by public authority . . . so as practically to make unjust and illegal discriminations between persons in similar circumstances . . . the denial of equal justice is still within the prohibition of the Constitution."). A plaintiff need not demonstrate racial discrimination was dominant in the reasoning for state action to trigger strict scrutiny, but only that it was a motivating factor. *United States v. City of Birmingham*, 727 F.2d 560, 565 (1984).

The Supreme Court "'has identified objective factors that may be probative of racially discriminatory intent among legislative bodies." *Id.* at 565 (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). First, "the fact…that the law [or practice] bears more heavily on one race than another" supports an inference of racial discrimination. *Farm Labor Org. Comm.*, 308 F.3d at 534 (quoting

*Washington v. Davis*, 426 U.S. 229, 242 (1976)).  *See also NAACP v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1047-48 (6th Cir. 1977).  Plaintiffs alleging race-based discrimination can demonstrate discriminatory effect "through the use of statistical" evidence showing that one class is being treated differently from another class that is otherwise similarly situated. *Farm Labor Org. Comm.*, 308 F.3d at 534 (internal citations omitted).  In addition, courts consider the historical background of the decision, the sequence of events, procedural and substantive departures from normal procedure, and legislative or administrative history." *Arlington Heights*, 429 U.S. at 267-68 (1977).  These factors, which consider both direct *and* circumstantial evidence of intent, are not exhaustive, and no one factor is dispositive. *Id.* at 266.

At the motion to dismiss stage, plaintiffs need only state a *plausible* claim for relief.  *Iqbal*, 556 U.S. at 678.  To support their claim, plaintiffs' complaint avers that over 50% of Michigan's black population came under PA 436's emergency management.  At the same time, only about 3% of Michigan's white citizens lived in communities that were governed by an EM.  To further support an inference of discriminatory intent, plaintiffs argue:  other majority white communities were experiencing the same or greater financial distress; numerous academics who studied the issue have

found clear discrimination under the law; the statute was passed under highly unusual and rushed circumstances; and it was adopted in response to biases against African-American school boards in Detroit.

A plaintiff can challenge the constitutionality of a statute in two ways. "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely." *Speet v. Schuette,* 726 F.3d 867, 871 (6th Cir. 2013) (internal quotation marks omitted). The plaintiff must establish "'that no set of circumstances exist under which [the statute] would be valid.'" *Id.* at 872 (quoting *United States v. Stevens,* 559 U.S. 460, 472 (2010)). In contrast, an as-applied challenge "argues that a law is unconstitutional as enforced against the plaintiffs before the court." *Id.* at 872.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). In fact, a claim can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications. *John Doe No. 1 v. Reed,* 561 U.S. 186, 194, 130 S.Ct.

2811, 177 L.Ed.2d 493 (2010). In constitutional challenges reaching beyond the plaintiff's circumstances, the plaintiff must satisfy the "standards for a facial challenge to the extent of that reach." *Id.; Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691–92 (6th Cir. 2015).

A. Facial Challenge

A facial challenge to a legislative act is the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the act would be valid. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987). In the earlier appeal of this case, the Sixth Circuit upheld PA 436 as a legitimate tool to address and resolve "the financial situation of a distressed locality . . . ." *Phillips*, 836 F.3d at 718. The Court reasoned:

> An entity in a distressed financial state can cause harm to its citizenry and the state in general. Improving the financial situation of a distressed locality undoubtedly is a legitimate legislative purpose, and PA 436, while perhaps not the perfect remedy, is one that is rationally related to that purpose. The emergency manager's powers may be vast, but so are the problems in financially distressed localities, and the elected officials of those localities are most often the ones who — through the exercise of their powers — led the localities into their difficult situations.

*Id.*

Plaintiffs' asserted constitutional violation is that PA 436 has a discriminatory purpose and violates equal protection guarantees because

the law "reduced residents of predominantly black municipalities to powerless political placeholders for those who maintained for their benefit the fiction of local democracy in places where emergency managers are in charge." (R. 1, Compl. ¶ 87). In plaintiffs' words, by revoking or restricting the political power of residents in majority African-descended communities, while exempting residents in similarly-situated majority white communities, PA 436 discriminates on the basis of race, both on its face and in its application.

A facially neutral law with a legitimate purpose will be subject to strict scrutiny "only if the plaintiff can prove that it 'was motivated by a racial purpose or object,' or 'is unexplainable on grounds other than race.'" *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002) (citations omitted). To make this determination, the court analyzes the five factors identified by the Supreme Court and the Sixth Circuit. *Village of Arlington Heights*, 429 U.S. at 266-68; *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369-70 (6th Cir. 2002).

### 1. Impact on Particular Racial Groups

Because PA 436 impacts financially troubled communities, all citizens residing in those Michigan communities are impacted by the fiscal emergency. While an overwhelming number of Michigan's black citizens

who were affected by the Act reside in just two of Michigan's cities—Flint and Detroit—both Detroit and Flint had objective financial difficulties. Predominantly white communities have also been subject to the Act, just as have predominantly black communities. In fact, four of the 14 jurisdictions under emergency management when this lawsuit was initially filed in 2013 were made up of more than 50% white citizens, with two overwhelmingly so: Allen Park (92.9% white and 2.1% black); Lincoln Park (84.2% white and 5.9% black); Hamtramck (53.6% white), and Wayne County (52.3% white).

### 2. Historical Background of Challenged Act

In enacting PA 436, the Legislature determined that local fiscal stability is necessary for the State's health, welfare, and safety, and thus, PA 436 is necessary to protect those interests. This is a reasonable non-racial explanation for the Act.

### 3. Sequence of Events Preceding Act

The legislative history of PA 436 demonstrates that addressing problems presented by the growing fiscal instability among the State's local governments was a significant concern of the Legislature.

### 4. Departures from Government's Normal Procedural Process

The Sixth Circuit rejected plaintiffs' argument that the passage of PA 436 departed from the normal procedure because it was passed during a "lame duck session." *See Phillips*, 836 F.3d at 721 ("Michigan would have been allowed to pass P.A. 436 even if it were identical to P.A. 4. See *Michigan Farm Bureau v. Hare*, 151 N.W.2d 797, 802 (Mich. 1967)."). Plaintiffs' general dissatisfaction with the legislative process that preceded the enactment of PA 436 does not inevitably lead to an inference of racial discrimination.

### 5. Legislative or Administrative History

The legislative history of PA 436 was recounted in the statement of facts above. Plaintiff has not demonstrated that the legislature had a racially discriminatory intent.

There is a clear non-racial explanation for why the majority of Michigan's black population came under emergency management, that being to restore financial stability among local governments. PA 436 is a facially neutral law with a legitimate purpose. Where plaintiffs fail to prove that the law is unexplainable on grounds other than race, the law will be subject to rational basis review. Such is the case here with plaintiffs' facial challenge.

To survive rational basis scrutiny, PA 436 need only be "rationally related to legitimate government interests[,]" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 313 (1993). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985); *Sailors*, 387 U.S. at 109 ("Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs.")

This court recognizes Michigan's legitimate government interest in preventing or rectifying the insolvency of its political subdivisions. Mich. Comp. Laws Ann. §141.1543 (West 2013) (finding it necessary to protect the credit of the state and the fiscal stability of the local governments in order to protect the health, safety, and welfare of the citizens of the state). The court thus finds that PA 436 survives rational basis review with regard to plaintiffs' facial challenge.

B. <u>As-Applied Challenge</u>

Plaintiffs' statistical evidence supports an inference of racial discrimination in that PA 436 treats majority black school districts differently than similarly situated majority white school districts. The court finds that the two school districts that have standing to challenge PA 436 have stated a plausible claim that the act violates the Equal Protection Clause as applied to them. Plaintiffs will be given the opportunity to engage in discovery limited to their as-applied challenge. However, plaintiffs will need to show much more than the statistical evidence they have presented at the complaint stage to survive summary judgment.

<u>CONCLUSION</u>

Defendants' motion to dismiss for mootness and lack of standing is granted as to all plaintiffs except for Pontiac Public Schools and Benton Harbor Area Schools. Defendants' motion to dismiss plaintiffs' facial challenge is granted. Defendants' motion to dismiss plaintiffs' as-applied challenge is denied. In addition, the claims against defendants Dillon and Clinton are dismissed as stipulated to by plaintiffs.

Dated: September 5, 2018

<u>s/George Caram Steeh</u>
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 5, 2018, by electronic and/or ordinary mail.


s/Marcia Beauchemin
Deputy Clerk